# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**ALBERT K ALEXANDER**                    **CASE NO.  6:11-CV-01749**

**VERSUS**                                **JUDGE ROBERT R. SUMMERHAYS**

**CITY POLICE OF LAFAYETTE,**             **MAG. JUDGE CAROL B. WHITEHURST**
**ET AL.**

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment [ECF No. 207] filed by Defendants.[1]

Plaintiff Albert Alexander ("Albert") opposes the motion [ECF No. 215], Defendants have filed a

reply in support [ECF No. 219], and Albert has filed a sur-reply in opposition [ECF No. 224]. Also

pending is Defendants' *Daubert* Motion to Exclude Testimony of Andrew J. Scott, III [ECF No.

204], Albert's proffered expert on police policies and procedures. Albert opposes the motion [ECF

No. 214], Defendants have filed a reply in support [ECF No. 217], and Albert has filed a sur-reply

in opposition [ECF No. 226].

## I.
### BACKGROUND

Albert filed this section 1983 action alleging that Defendants conducted warrantless

searches of his house, illegally seized his property, arrested him without probable cause, and

employed excessive force against him and his property in violation of his constitutionally protected

rights. The summary judgment record reflects that on December 29, 2010, Lafayette Police

Officers Jason Eppley and Gustavo Sanchez responded to a call by Sharlette Alexander

---

[1] The Defendants are Former Chief of Police James Craft, Officer Kristina Bernard Strong, Officer Jarvis Mayfield, Former Officer Dwayne Arceneaux, Officer Kyle Manceaux, Former Officer Greg Cormier, Officer Calvin Parker, and Officer Jeff Hebert, each sued in their individual capacity.

("Sharlette") and Dashawna Morrison ("Dashawna").[2] The women told police they had been living with Albert at 212 I-B Street in Lafayette, Louisiana, but that on December 28, 2010, Albert ordered the women to vacate the house and struck them while they attempted to leave.[3] The officers' report notes that on "the original call on December 28th," neither Sharlette nor Dashawna "showed injuries consistent with the above statements," but on December 29th, officers "observed a small cut on Sharlette's lower lip and [a] scratch on the right side of her neck."[4]

On January 3, 2011, Officer Kristina Strong (also referred to in the record as Kristina Bernard or Kristina Breaux) conducted a follow-up investigation of the report by Sharlette and Dashawna which included interviewing them.[5] Sharlette told Strong that Albert is her grandfather and that he had allowed her and Dashawna—Sharlette's girlfriend—to live in his home for several months in 2010.[6] While living there, Sharlette stated that she observed one or more firearms and knew that Albert was a convicted felon.[7] She also stated that she witnessed Albert beating his girlfriend, Cassandra Gallien ("Cassandra"), "numerous times." [8] Based on her time living in the home and on statements by Albert, Sharlette asserted that there were "numerous items in the residence which she believed to be stolen[,] including big screen televisions, [DVD] players, furniture and other electronics."[9] In a supplemental report, Strong noted that Sharlette and Dashawna alleged that the stolen items were "scattered throughout the residence and most were still new in boxes."[10]

---

[2] ECF No. 207-4 at 6.
[3] *Id.*
[4] *Id.* It is unclear what "the original call" refers to, as the report states that the altercation occurred on December 28, 2010, but "was not reported" until the following day.
[5] ECF Nos. 207-4 at 12-13; 207-5 at 24-26.
[6] ECF No. 207-4 at 12-13.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.* at 51.

According to Strong's report, Dashawna separately stated that she had also observed a long, black and brown rifle at Albert's home, as well as "a number of stolen items … including furniture, electronics and even a hot tub."[11] Dashawna reported that Albert had revealed to her that he had stolen many of the items, and had bragged about not getting caught.[12] Regarding the altercation on December 28, 2010, Dashawna stated that she, Sharlette, and Albert got into an argument, and that Albert ordered the two women to pack their things and leave.[13] Dashawna alleged that as she and Sharlette were leaving, the screen door slammed shut, which caused Albert to fly into a rage.[14] Dashawna stated that Albert pushed Sharlette to the ground and punched her in the face several times, then "football tackled" Dashawna and punched her in the face several times before the women were able to escape.[15] Dashawna called 911 and spoke to an unknown officer but was not given a case number.[16] Shortly thereafter, Dashawna flagged down a passing police unit.[17] The officer escorted the women back to 212 I-B Street to retrieve their belongings, but there was no answer at the door.[18] The women then left and stayed with a relative of Dashawna.[19] Sharlette's report recounted the same series of events.[20] The women informed Strong that they wished to press charges against Albert for simple battery.[21]

After obtaining these statements, Strong reviewed Albert's criminal record, which included a history of arrests or charges for domestic abuse, battery, and weapon possession.[22] Strong

---

[11] *Id.* 12-13.
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.* 53.
[22] *Id.*

reached out to Albert to obtain his account of the incident but Albert refused to provide a statement.[23] Officer Calvin Parker advised Strong that he was separately investigating Albert regarding a report of threats he allegedly made to the lives of Albert's son, Todd Alexander ("Todd"), and Todd's daughter.[24] Parker advised that he had spoken with other members of Albert's family who stated that they had observed firearms in Albert's residence.[25] Strong and Parker also found that Albert was named as a suspect in two unrelated reports made by Tracy Shelvin ("Tracy") on December 28, 2010.[26] Tracy alleged that Albert had entered her residence without permission, threatened her and her children, and stole a telephone from her when he left.[27] Tracy alleged that after Albert left, he later threatened her again by phone.[28] Based on allegations that Albert had committed violence and threats of violence against Sharlette, Dashawna, Todd, and Tracy within a few days of each other—as well as evidence that he had a history of domestic violence—Strong and Parker concluded that Albert likely "posed an imminent threat to his family[,] especially with the presence of firearms."[29]

On January 4, 2011, Strong obtained two arrest warrants for Albert based on his alleged batteries of Sharlette and Dashawna.[30] She also obtained a warrant on the same day to search for and seize any firearms and ammunition found in Albert's home ("the first search warrant").[31] Parker obtained a separate arrest warrant, also on January 4, 2011, based on the alleged improper telephone communications with Todd.[32]

---

[23] ECF Nos. 207-5 at 55; 207-6 at 72-73.
[24] ECF No. 207-4 at 90.
[25] *Id.* 12-13.
[26] *Id.* 53.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.* at 12-13, ECF No. 207-6 at 269-70.
[31] ECF Nos. 207-4 at 12-13; 207-6 at 273-74.
[32] ECF No. 207-6 at 272.

Strong's application for the first search warrant requested permission to search 212 I-B Street and seize "[a]ny and all firearms, ammunition, ammunition clips, ammunition boxes, firearm storage boxes, spent projectiles, spent cartridges, [and] firearms or ammunition paperwork."[33] In support of the request, the application stated that: "witnesses observed a brown and black shotgun … on numerous occasion" inside the residence near the back door; Albert is prohibited from possessing firearms because he was previously convicted of "[f]elony [t]heft, simple kidnapping, and 2 counts of felony simple burglary;" Albert had been arrested in the past for "assault, kidnapping, simple battery, violation of a protective order, 2nd degree battery, and simple battery domestic," as well as being "arrested several times for possession of a firearm;" and during Parker's separate investigation into Albert's alleged threats against Todd and Todd's child, "several family members and associates close to Mr. Albert expressed their fear of him due to having the means (firearm) and the violent tendencies toward them."[34] The application was signed on January 4, 2011 by Judge Rubin of the Fifteenth Judicial District Court for the Parish of Lafayette, Louisiana.[35]

The first search warrant was executed on January 4, 2011.[36] Officers did not discover any firearms but found two "large pellet rifles."[37] Officers also observed numerous electronic items including "flat screen televisions, blue ray dvd [sic] players, surround sound systems and other expensive electronics," which were "new in boxes," wrapped in plastic, or "in pillow cases or placed on blankets."[38] These items were not concealed or hidden.[39] While at 212 I-B Street, Strong called Dashawna, who confirmed that the firearms she had seen were stored behind an armoire

---

[33] *Id.* at 273.
[34] *Id.*
[35] ECF Nos. 207-6 at 273; 207-4 at 51.
[36] ECF No. 207-6 at 51.
[37] ECF No. 207-4 at 13, 53.
[38] ECF Nos. 207-6 at 275; 207-4 at 53.
[39] *Id.*

near the rear entrance, which is where the pellet rifles were found.[40] Strong concluded that Dashawna, who had little knowledge or experience with firearms, had mistakenly identified the pellet rifles as firearms.[41] While on the phone, Dashawna further confirmed that Albert had told her that many electronics and other items observed by the officers at the residence, including the items that were still in boxes and original packaging, were stolen.[42] Based on this information "indicating many of these items were stolen," officers seized those items for further investigation.[43] During the search, officers also observed new furniture "such as bedroom sets and living room sets" that were "stacked against the walls of the residence, not being used."[44] In addition to witness statements that Albert possessed stolen furniture at the residence, Strong found the furniture sets suspicious because the house contained more furniture than could be used in the residence at one time.[45] Officers did not seize the furniture items, but took photographs of them and noted their descriptions for further investigation.[46] After the search was concluded, Strong and Parker discovered that Clayton Mobile Homes had filed reports of stolen property that matched the description of some of the furniture discovered at 212 I-B Street.[47]

On January 5, 2011, Strong applied for a second search warrant ("the second search warrant").[48] In the application, Strong recounted that during the execution of the first search warrant, officers observed and seized for further investigation electronics and items not named in the first search warrant, based on witness statements that they had been stolen.[49] Strong also stated

---

[40] ECF No. 207-5 at 45-46.
[41] ECF No. 207-4 at 53-54.
[42] ECF No. 207-5 at 46-47.
[43] ECF No. 207-6 at 275.
[44] *Id.*
[45] ECF No. 207-5 at 109-110.
[46] ECF No. 207-6 at 275.
[47] *Id.*; ECF No. 207-4 at 54.
[48] ECF No. 207-6 at 275.
[49] *Id.*

that officers observed and photographed furniture in the home, and later discovered that some of it matched the description of property which had been reported stolen by Clayton Mobile Homes.[50] The second warrant application sought permission to seize "[h]ousehold furniture including but not limited to: tan sofa and matching love seat, dark brown leather recliner, canvass [sic] print chair with foot rest, various portraits, large artificial palm tree plants, 1 bedroom set cherry wood in color (dresser, bed side table, head and food board, and mattresses) and rugs"[51] and "to return any and all furniture items that may belong to" Clayton Mobile Homes.[52] The application was signed the same day it was submitted.[53] The second search warrant was executed on January 5, 2011.[54] The furniture items located during the search were loaded into a police horse trailer and stored overnight.[55]

On January 6, Strong applied for a third search warrant ("the third search warrant").[56] In the third search warrant application, Strong stated that during the second search, officers observed "a Whirlpool Jacuzzi Tub, several pallets of shingles, and a hot water heater," which had not been noted or photographed during the previous searches.[57] Officers also observed "numerous power tools," "construction items such as concrete stepping stones ... and insulation," and "yard equipment including chain saws, several weedeaters and back pack leaf blowers."[58] Officers photographed these items and recorded their serial numbers during the second search.[59] After the second search, Officers discovered that Van Allen Homes, Home Depot, and Lowe's Home

---

[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*, ECF No. 207-4 at 51.
[54] ECF No. 207-6 at 277.
[55] ECF No. 207-4 at 54.
[56] ECF No. 207-6 at 277.
[57] *Id.*
[58] ECF No. 207-4 at 54.
[59] ECF No. 207-6 at 277.

Improvement had reported stolen items that matched the items observed at 212 I-B Street, and some of these reports provided serial numbers that matched the serial numbers of items found at the residence.[60]

Albert also alleges that, during the second search on January 5, 2011, two pet dogs at 212 I-B Street were seized and not returned.[61] Several of Albert's relatives, neighbors, and friends provided declarations supporting the claim that two pet dogs lived at the home prior to the searches, and veterinary records list Albert as the dogs' owner.[62] However, Defendants point to evidence in the summary judgment record that Albert was not the owner of the dogs in question.[63] At a deposition, Major Blair Dore, then a member of the Lafayette Police Department S.W.A.T. team who assisted with the searches of 212 I-B Street, testified that a threat assessment prepared prior to the searches noted that one dog lived at the residence.[64] Dore did not remember encountering any dogs during the search or, if any were present, what happened to them.[65] Strong also testified that she did not remember encountering or seizing any dogs at 212 I-B Street during any search.[66] Albert alleges that an animal control report shows that two dogs were seized during the second search.[67] However, when presented with that record, Strong testified that it only showed that a call was made to animal control reporting loose or vicious dogs at or near that address; it did not show that any animals were located or seized by animal control.[68] Parker offered the same evaluation

---

[60] Id., ECF Nos. 207-4 at 21; 207-5 at 55; 207-4 at 54.
[61] ECF No. 215 at 43-45.
[62] ECF Nos. 85-88; 207-7 at 357-60; 207-6 at 279-83.
[63] Albert testified at deposition that the dogs were gifted to his daughters Oraleeta and Amarie by his stepson Travis. ECF No. 207-6 at 40. An early declaration by Albert refers to the dogs as "family pets" and seeks damages for emotional distress experienced by his minor daughters and their respective mothers due to the loss. ECF No. 23. Oraleeta and Amarie are not plaintiffs in this matter, nor is either of their mothers. Therefore, it is not clear that Albert has a cognizable interest in the pets.
[64] ECF No. 207-7 at 317-19.
[65] Id.
[66] ECF No. 207-5 at 53-54.
[67] Id.
[68] Id.

of that report.[69] Regardless of their ownership, the summary judgment record does not include evidence showing that any of the named defendants seized the dogs.

On January 6, 2011, Strong transferred the furniture seized during the second search to representatives of Clayton Mobile Homes.[70] On the same day, she applied for the third search warrant.[71] In the third search warrant application, Strong described the previous searches, the observation of a hot tub, roofing shingles, and a water heater, and the discovery of reports alleging that matching items had been stolen.[72] The third search warrant application requested permission to seize and return the hot tub, shingles, and water heater.[73] The application was signed by Judge Castle of the 15th Judicial District Court on the day it was submitted.[74] Strong met representatives of Van Allen Homes, Home Depot, and Lowe's Home Improvement at 212 I-B Street and transferred the suspected stolen property to them.[75]

Each search warrant was executed with the assistance of a S.W.A.T. team.[76] According to Dore, S.W.A.T. assistance had to be requested by an investigating officer.[77] Upon receipt of such a request, the S.W.A.T. team conducted a threat assessment, which applied numerical values to objective aspects of the premises of the operation, the crimes alleged, and the history of the accused.[78] If a total numerical threshold was reached, the S.W.A.T. team would recommend that

---

[69] ECF No. 207-4 at 135. This record appears to reflect a report made on January 5, 2011 of two dogs described as "LOOSE OR VICIOUS" at or near 212 I-B Street. ECF No. 207-7 at 363. However, Officers Strong and Parker testified that the document shows that the report was made *via* a call—made by someone other than a police officer—which was routed to Animal Control, and the disposition being noted as "B" indicates that no dogs were found, because seizure of dogs would have required a "D" disposition. ECF Nos. 207-4 at 15-36, 207-5 at 53-55.
[70] ECF No. 207-4 at 54.
[71] ECF No. 207-6 at 277.
[72] *Id.*
[73] *Id.*
[74] *Id.*, ECF No. 207-4 at 51.
[75] ECF No. 207-4 at 55.
[76] *Id.* at 53-55.
[77] ECF No. 207-7 at 312-13.
[78] *Id.*

it be deployed on the operation.[79] The Chief of Police—then defendant James Craft—would then be notified of the request, the outcome of the threat assessment, and the S.W.A.T. team's recommendation. While deployment of the S.W.A.T. team required the Chief's final approval, he typically followed the team's recommendation based on the threat assessment.[80]

On January 7, 2011, Albert was arrested and charged pursuant to outstanding arrest warrants arising from allegations by Sharlette, Dashawna, Todd, and Tracy.[81] Strong and Parker continued their investigation into other items that had been seized from 212 I-B Street. The officers met with representatives from Fred's Discount Store and Sam's Wholesale about certain seized items which were only sold locally at those stores.[82] Strong's report states that the representatives provided documentation that items matching the description or identification number of items seized from 212 I-B Street had been stolen from their stores.[83] The officers returned the identified items to the representatives.[84]

On January 10, 2011, Albert was charged with six (6) counts of possession of stolen property, arising from the discovery of property at 212 I-B Street that had been reported as stolen by Clayton Mobile Homes, Van Allen Homes, Home Depot, and Lowe's Home Improvement.[85] Trial was held in January 2014 on charges of possession of furniture that had been reported stolen by Clayton Mobile Homes and a hot tub reported stolen by Van Allen Homes.[86] At trial, Cassandra testified that she lived at 212 I-B Street with Albert until approximately March 2010, when they each left, and Albert did not return to the home until after he was released from detention.[87]

---

[79] Id.
[80] Id.
[81] ECF No. 207-4 at 55.
[82] Id.
[83] Id.
[84] Id.
[85] Id.
[86] ECF Nos. 215 at 6; 207-7 at 156-59.
[87] ECF No. 207-7 at 76-77.

Cassandra testified that after she and Albert left 212 I-B Street, Sharlette and Dashawna were allowed to move in.[88] Cassandra testified that she did not recognize any of the purportedly stolen furniture that was taken from the home by police, and that it was not in the home when she left.[89] Tracy testified that after Albert and Cassandra moved out of 212 I-B Street in the spring of 2010, Sharlette, Dashawna, and Todd all lived there together.[90] Mark Thomas ("Mark") testified that in approximately October of 2010, he helped Todd, Sharlette, and Dashawna move the stolen furniture, except for the hot tub, to 212 I-B Street. Mark testified that he did not know the furniture had been reported stolen, and Albert was not involved with the move in any way.[91]

In his closing argument at trial, Albert's attorney asserted that Albert was staying temporarily at 221 Conrad Street in Lafayette, Louisiana at the time the search warrants were executed at 212 I-B Street.[92] This was supported by the testimony of an employee of the Louisiana Department of Children and Family Services, who met with Albert at 221 Conrad Street on multiple occasions as part of an investigation.[93] According to argument of Albert's counsel, Sharlette, Dashawna, and Todd were the only residents of 212 I-B Street when the searches occurred, and they brought the stolen goods into the home.[94] Counsel argued that Albert had no reason to know the stolen goods were in the home, and did not have a car or truck that could transport them.[95] According to counsel, the only evidence tying Albert to the stolen goods at 212 I-B Street was the fact that he owned the residence.[96] He further argued that the state was "unable to show … that Albert himself knew, or should have known that the items were stolen. Why?

---

[88] *Id.* at 82-83.
[89] *Id.* at 76-77.
[90] *Id.* at 97-98.
[91] *Id.* at 116-21.
[92] *Id.* at 140-43.
[93] *Id.*
[94] *Id.*
[95] *Id.* at 143.
[96] *Id.* at 144.

Because Albert himself didn't even know those items were in his house at all."[97] Counsel then argued:

> "[The stolen] property went to that house by way of Todd, [Sharlette], and [Dashawna]. [Albert], himself, didn't know that the property was stolen at all. The case is simple. [Police] found property at I-B, they picked it up. Albert had nothing to do with it. He's an innocent man. If Albert can tell you who it belonged to he would say so…. [H]e knows [Sharlette] put it there. He doesn't know how they got it at all…. He didn't even know the hot tub was there."[98]

Albert was found not guilty of possession of stolen goods.[99]

In September 2011, Albert filed this suit *pro se* against an array of defendants, both private and public individuals and entities, alleging various civil rights violations, including unreasonable searches and seizures of his person and property and conspiracy to retaliate against him for filing an earlier civil rights lawsuit against the department and former chief Craft.[100] The case was stayed due to Albert's incarceration and ongoing state criminal proceedings, and the stay was lifted in January 2016. After a series of amendments and dismissal of certain claims and defendants, the Court ordered Albert to file a final amended complaint that addressed the deficiencies identified thus far.[101] In response, and now represented by counsel, Albert filed "Plaintiff's Third Supplemental and Amending Complaint for Violations of 42 U.S.C.A. §1983, §1985(3), and Related Claims"[102] ("Amended Complaint").

Albert alleges claims against the Defendants for (1) unreasonable search, seizure, and detention of Albert's person in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution;[103] (2) unreasonable search, seizure, and detention of Albert's personal

---

[97] *Id.* at 145.
[98] *Id.* at 145-46.
[99] ECF No. 63-1 at 20.
[100] ECF No. 1.
[101] ECF No. 187.
[102] ECF No. 191.
[103] *Id.* at ¶ 19.

property in violation of the Fourth, Fifth, and Fourteenth Amendments;[104] (3) obtaining a false search warrant, in violation of Fourth and Fourteenth Amendments;[105] (4) malicious prosecution, abuse of process, false swearing, fraud, or unlawful pretrial detention, in violation of the Fourth and Fourteenth Amendments;[106] (5) excessive force, in violation of the Fourth, Eighth, and Fourteenth Amendments;[107] and (6) conspiracy to deprive Albert of his constitutional rights in violation of 42 U.S.C. § 1985(3).[108] Albert alleges he has suffered economic, property, reputational, and medical damages, including mental duress and permanent disability caused by stress.[109] Albert seeks compensatory damages of one hundred twenty-five million dollars ($125,000,000.00), general damages of one hundred twenty-five million dollars ($125,000,000.00), nominal damages of no less than fifty thousand dollars ($50,000.00), and attorney's fees.[110]

Defendants subsequently moved for summary judgment, arguing that they are entitled to qualified immunity, that each of the searches and seizures was premised on probable cause, that Albert lacks standing to assert claims for property at the residence, and that there is no genuine dispute of material fact as to the remaining claims.[111] Albert opposes the motion,[112] Defendants have filed a reply in support,[113] and Albert has filed a sur-reply in opposition.[114]

---

[104] *Id.* at ¶¶ 20, 35.
[105] *Id.* at ¶ 37.
[106] *Id.* at ¶ 41.
[107] *Id.* at ¶ 44. This fifth claim is labeled "Plaintiff's Claim Number 6."
[108] *Id.* at ¶ 46. This sixth claim is labeled "Plaintiff's Claim Number 7."
[109] *Id.* at ¶ 52.
[110] *Id.* at ¶ 53.
[111] ECF No. 207.
[112] ECF No. 215.
[113] ECF No. 219.
[114] ECF No. 224.

## II.
### LEGAL STANDARDS

To prevail on a motion for summary judgment, the movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[115] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[116] The movant "bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial."[117] Typically, if the non-movant will bear the burden of proof at trial, "the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."[118] However, a qualified immunity defense "alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available."[119]

The defense of qualified immunity is "is an immunity from suit rather than a mere defense to liability."[120] The doctrine operates to shield government officials "acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known."[121] Stated differently, qualified immunity protects government officials from civil liability only "when their

---

[115] Fed. R. Civ. P. 56(a).

[116] *Quality Infusion Care, Inc. v. Health Care Service Corp.*, 628 F.3d 725, 728 (5th Cir. 2010); *see also Roy v. City of Monroe*, 950 F.3d 245, 254 (5th Cir. 2020) ("There exists a 'genuine dispute' about a material fact . . . when the evidence would allow a reasonable jury to return a verdict for the nonmovant.").

[117] *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

[118] *Id.*

[119] *Roy*, 950 F.3d at 254 (quoting *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016)); *see also Rogers v. Jarrett*, 63 F.4th 971, 975 (5th Cir. 2023) ("plaintiffs bear the 'burden' to 'demonstrate the inapplicability of the [qualified immunity] defense.'") (quoting *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002)).

[120] *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

[121] *Wallace v. County of Comal*, 400 F.3d 284, 289 (5th Cir. 2005) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

actions could reasonably have been believed to be legal."[122] The court employs a standard of "objective reasonableness" to define "the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest."[123] To overcome a qualified immunity defense, the movant must establish: (1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the violation.[124] Although the plaintiff bears the burden of negating qualified immunity, all inferences must be drawn in his favor.[125] If the plaintiff satisfies this burden, the government official will not be shielded from liability on the basis of qualified immunity.[126]

## III.
### DISCUSSION

### A. *Franks* Claims.

Defendants seek dismissal of Albert's claims that they recklessly, if not knowingly, obtained search and arrest warrants by submitting applications that included false statements or material omissions which were necessary to the finding of probable cause.[127] Such claims arise under the Fourth Amendment as described by the Supreme Court in *Franks v. Delaware*.[128] Albert objects, contending that he "does not allege a formal '*Franks* violation' in this civil case,"[129] and asserts erroneously that *Franks* claims are only available in criminal matters.[130] Albert repeats in

---

[122] *King v. Handorf*, 821 F.3d 650, 654 (5th Cir. 2016) (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011)).

[123] *Malley v. Briggs*, 475 U.S. 335, 344 (1986); *see also Winfrey v. Rogers*, 901 F.3d 483, 493 (5th Cir. 2018).

[124] *Ford v. Anderson Cnty., Texas*, 102 F.4th 292, 307 (5th Cir. 2024).

[125] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010); *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020).

[126] *Buehler v. Dear*, 27 F.4th 969, 981 (5th Cir. 2022).

[127] ECF No. 207-1 at 85.

[128] *See Hughes v. Garcia*, 100 F.4th 611, 618 (5th Cir. 2024)(citing *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)).

[129] ECF No. 215 at 10.

[130] *See, e.g., Hughes*, 100 F.4th 611 (analyzing a *Franks* claim in the context of a suit brought under section 1983).

his sur-reply that he is not alleging a *Franks* violation, and claims that Defendants "contort [his] factual allegations" to falsely suggest that he is.[131]

Contrary to Albert's objections, the Amended Complaint explicitly states:

> **Plaintiff's Claim Number 3** raises **violations of *Franks v. Delaware***, and the Constitution of the United States of America, Fourth and Fourteenth Amendments, by Officers Bernard, Parker, Mayfield, Manceaux, and Cormier, and by Chief Craft, in their individual capacities, as established in *Franks v. Delaware*. The unconstitutional conduct of the defendant officers in falsely obtaining a warrant **is [an] actionable 1983 violation.**[132]

The Amended Complaint goes on to allege that Defendants "with deliberate indifference and/or intentionally provided and included false and stale information in the warrant or application to obtain a warrant for search and seizure and the arrest of the plaintiff."[133] Despite Albert's unequivocal assertion of *Franks* claims in the Amended Complaint, he has just as clearly abandoned those claims.

Accordingly, Defendants' motion is granted with respect to Albert's *Franks* claims, and those claims are dismissed.

## B.  Fifth Amendment Claims.

Defendants seek dismissal of Albert's Fifth Amendment claims against them on the grounds that the Fifth Amendment's protections only apply to federal actors, and Albert has only asserted conduct by state officials.[134] Albert does not address this argument, aside from making a conclusory suggestion that his Fifth Amendment rights were violated.[135]

---

[131] ECF No. 224 at ¶ 4-5.
[132] ECF No. 191 at ¶ 37 (emphasis in original, citation omitted).
[133] *Id.* at ¶ 38.
[134] ECF No. 207-1 at 85 (alteration omitted).
[135] ECF No. 215 at 21.

The Amended Complaint asserts that Defendants violated the Fifth Amendment through their illegal search and seizure of his person and his property.[136] As Defendants note, "the Fifth Amendment's due process clause applies only to federal actors" and therefore is not the proper means to challenge searches and seizures by state actors.[137] The Amended Complaint does not allege any conduct by any federal official that gave rise to the current suit.

Accordingly, Defendants' motion is granted as to Albert's Fifth Amendment claims, which are dismissed.

## C. Fourteenth Amendment Substantive Due Process Claims.

Albert asserts that Defendants violated his substantive due process rights under the Fourteenth Amendment through unreasonable search, seizure, or detention of his person;[138] unreasonable searches, seizures, or detention of his property;[139] malicious prosecution;[140] and the use of excessive force.[141] Defendants argue these claims should be dismissed because they are properly asserted under the Fourth Amendment rather than the more general substantive due process protections in the Fourteenth Amendment.[142] They alternatively argue that the Fourteenth Amendment does not provide recovery for negligently inflicted harms, and does not protect against erroneous arrest so long as the conduct is not shocking to the conscience.[143] Albert denies that he is asserting that Defendants acted negligently, and argues that the way he and his property were

---

[136] ECF No. 191 at ¶¶ 19-20.
[137] *Lucky Tunes #3, L.L.C. v. Smith*, 812 F. App'x 176, 183 (5th Cir. 2020)(citing *Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000)).
[138] ECF No. 191 at ¶ 19.
[139] *Id.* at ¶ 20.
[140] *Id.* at ¶ 41.
[141] *Id.* at ¶ 44. Albert also asserts Defendants violated the Fourteenth Amendment by falsely obtaining a warrant, ECF No. 191 at ¶ 37, but as discussed above, he has abandoned those claims.
[142] ECF No. 207-1 at 85-87.
[143] *Id.* at 87-88.

treated "shocks the conscience."[144] Albert also argues that state law claims for conversion are insufficient to remedy the rights violations he asserts.[145]

When a plaintiff claims a violation of a right protected by a specific provision of the Constitution, that specific provision, "not the more generalized notion of 'substantive due process,'" is the proper lens through which to analyze the claim.[146] Warrantless searches and seizures without probable cause,[147] malicious prosecution,[148] and use of excessive force[149] are prohibited by the Fourth Amendment. Accordingly, the Fourteenth Amendment protection of substantive due process is not the proper source of Albert's claims.

Accordingly, Defendants' motion is granted as to Albert's Fourteenth Amendment substantive due process claims, which are dismissed.

### D. Malicious Prosecution Claims.

Albert asserts[150] claims under the Fourth and Fourteenth Amendments for "malicious prosecution, abuse of process, false swearing, fraud, or unlawful pretrial detention … as espoused in *Manuel v. City of Joliet, Ill.*[151] and *Albright v. Oliver*."[152] The Court must first determine what, if any, constitutionally cognizable claims are asserted.

A claim for "abuse of process" falls under the rubric of "common law torts which protect the interest in freedom from unjustified litigation," including "malicious prosecution" and

---

[144] ECF No. 215 at 45-47.
[145] *Id.*
[146] *Arnold v. Williams*, 979 F.3d 262, 270 (5th Cir. 2020)(quoting *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)).
[147] *Albright,* 510 U.S. at 274.
[148] *Thompson v. Clark*, 596 U.S. 36, 44, 142 S. Ct. 1332, 1338, 212 L. Ed. 2d 382 (2022).
[149] *Ramirez v. Knoulton*, 542 F.3d 124, 128 (5th Cir. 2008)(citing *Colston v. Barnhart*, 130 F.3d 96, 102 (5th Cir.1997)).
[150] ECF No. 191 at ¶ 41.
[151] 137 S. Ct. 911 (2017).
[152] 510 U.S. 266 (1994).

"wrongful civil proceedings."[153] "[T]he common law tort of misuse of legal procedure, without more, does not rise to the level of constitutional wrong remedied by Section 1983."[154] Though the Amended Complaint asserts "false swearing [or] fraud," the only allegations of fraud or false swearing occur in the context of Albert's conspiracy claims[155]—addressed separately below—or his *Franks* claims, which he has abandoned. Accordingly, Albert does not assert a cognizable constitutional claim for abuse of process separate from malicious prosecution.

False imprisonment and unlawful pretrial detention assert the same constitutional violation, which is a separate claim from malicious prosecution, though each claim is cognizable under the Fourth Amendment.[156] Albert cites *Manuel* and *Albright*, which together held that pretrial detention violates Fourth Amendment protections when legal process was not based on probable cause, whether detention occurs before or after the process was initiated.[157] Accordingly, the Court reads the Amended Complaint to assert separate claims for malicious prosecution and unlawful pretrial detention. In this section, the Court discusses only Albert's malicious prosecution claims.

Defendants seek dismissal of Albert's malicious prosecution claims, asserting that the summary judgment record shows that Albert cannot prove a lack of probable cause for his arrest, nor malice by any of the defendants.[158] Albert contends that his malicious prosecution claims cannot be separated from his claims of conspiracy under section 1985(3) because his prosecution was not based on probable cause and was the result of the conspiracy.[159]

---

[153] *Barra v. Boudreaux*, No. 6:18-CV-01162, 2020 WL 1695124, at *4 (W.D. La. Apr. 6, 2020)(citing *Sisk v. Levings*, 868 F.2d 159, 161 (5th Cir. 1989); *Beker Phosphate Corp. v. Muirhead*, 581 F.2d 1187, 1188 n. 1 (5th Cir. 1978)).
[154] *Id.*
[155] ECF No. 191 at ¶¶ 47-48.
[156] *Winfrey v. Rogers*, 901 F.3d at 492 (considering whether the plaintiff's claim "more closely resembles one for false imprisonment or one for malicious prosecution").
[157] *Manuel*, 580 U.S. at 364-66.
[158] ECF No. 207-1 at 89-91.
[159] ECF No. 215 at 51-54.

To overcome an assertion of qualified immunity, a plaintiff must both "(1) allege facts that make out a violation of a constitutional right, and (2) show that the right at issue was clearly established at the time of the defendants' alleged misconduct."[160] Fifth Circuit caselaw between 2003 and 2021 explicitly denied the existence of a "freestanding constitutional right to be free of malicious prosecution."[161] In 2022, the Supreme Court repudiated the Fifth Circuit's doctrine in *Thompson v. Clark*,[162] holding that a plaintiff may bring a claim under the Fourth Amendment for malicious prosecution separate from other traditionally recognized claims. However, for purposes of qualified immunity, the Court must consider the law that was clearly established at the time of the alleged misconduct—here, 2011.[163] At that time, claims for conduct that might constitute the state law tort of malicious prosecution were only cognizable for section 1983 purposes as a species of unreasonable search and seizure under the Fourth Amendment, and Albert has asserted those claims separately.[164] In sum, there was no "clearly established" right under the Fourth Amendment to be free from malicious prosecution in the Fifth Circuit at the time of the conduct giving rise to Albert's malicious prosecution claims.[165]

---

[160] *Espinal v. City of Houston*, 96 F.4th 741, 748–49 (5th Cir. 2024)(quoting *Jennings v. Patton*, 644 F.3d 297, 300 (5th Cir. 2011))(internal quotation marks and alterations omitted).

[161] *Castellano v. Fragozo*, 352 F.3d 939, 945 (5th Cir. 2003); *see also Guerra v. Castillo*, 82 F.4th 278, 289 (5th Cir. 2023).

[162] 596 U.S. 36, 42, 142 S.Ct. 1332, 212 L.Ed.2d 382 (2022).

[163] *Guerra*, 82 F.4th at 289; *see also Wallace v. Taylor*, 22-20342, 2023 WL 2964418, at *6 (5th Cir. Apr. 14, 2023) ("While the Fourth Amendment right to be free from arrest absent probable cause has been clearly established for some time, there was no clearly established Fourth Amendment right to be free from malicious prosecution at the time of Wallace's arrest.").

[164] *Espinal*, 96 F.4th at 748–49 (quoting *Morgan v. Chapman*, 969 F.3d 238, 245-46 (5th Cir. 2020)).

[165] *See Guidry v. Cormier*, No. 6:20-CV-01430, 2024 WL 3445499, at *3 n.33 (W.D. La. July 17, 2024)(citing *Wallace*, 2023 WL 2964418, at *6. *See also, Espinal*, 96 F.4th at 748–49; *Armstrong v. Ashley*, 60 F.4th 262, 267 (5th Cir. 2023). The Court notes that in *Hughes*, 100 F.4th at 619, the Fifth Circuit affirmed the dismissal of a qualified immunity defense to constitutional malicious prosecution claims. There, however, the court only discussed whether there had been a *Franks* violation and whether probable cause existed for the arrest. Albert does not assert *Franks* violations, and the lack of probable cause alone is not sufficient to support a malicious prosecution claim. Similarly, in *Bledsoe v. Willis*, No. 23-30238, 2023 WL 8184814, at *6 (5th Cir. Nov. 27, 2023), the Fifth Circuit also affirmed the dismissal of a qualified immunity defense to constitutional malicious prosecution claims. However, there the court held that the plaintiff stated a Fourth Amendment claim when he alleged he was arrested and charged "based on false reports written by a police officer and an evidence technician" because "the initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if

Accordingly, Defendants' motion is granted as to Albert's Fourth Amendment malicious prosecution claims, which are dismissed.

## E. **Eighth Amendment Claims.**

Albert alleges that the Defendants used excessive force under the Eighth Amendment when they employed a S.W.A.T. team to assist with the searches and used "force sufficient to destroy [his] home and much of its contents" and "euthanize his innocent pets."[166] Such force was used intentionally to "humiliate [Albert] and induce him into abandoning his civil suit against the department."[167]

To the extent Albert claims excessive force was used against his property, Defendants argue that the *Parratt/Hudson* doctrine applies to preclude a section 1983 claim for deprivation of property because there is an available state law remedy.[168] Alternatively, they argue that the claim should be dismissed because Albert did not own the home when it was searched and cannot prove that the Defendants damaged the home, or that any damage was *de minimis* and does not rise to the level of an Eighth Amendment violation.[169] As to Albert's claims of excessive force against his person, Defendants argue he has not alleged any personal injury, and alternatively the use of the S.W.A.T. team was reasonable.[170] Albert responds that no "reasonable, well-trained and experienced" officer would have employed a S.W.A.T. team to execute a search or arrest warrant against someone who had been accused of simple battery, threatening telephone communications, and possession of stolen goods.[171] Therefore, according to Albert, the Defendants' actual motive

---

the accused is seized and arrested, for example." Without more, the conduct alleged there is consistent with a claim of seizure without probable cause, rather than malicious prosecution.
[166] ECF No. 191 at ¶ 45.
[167] *Id.*
[168] ECF No. 207-1 at 79.
[169] *Id.* at 79-81.
[170] *Id.* at 82-85.
[171] ECF No. 215 at 47-50.

in employing a S.W.A.T. team must have been to impose excessive force in the form of "intimidation and harassment" against Albert.[172]

The Eighth Amendment, relevantly, "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes."[173] That includes a prohibition on the use by prison officials of excessive force against prisoners in their persons.[174] The Eighth Amendment's protections, however, do not attach until after there has been "a formal adjudication of guilt."[175] Albert does not assert that excessive force was used against his person, nor does he assert that there has been a formal adjudication of his guilt. To the contrary, there is no dispute that he was acquitted of some charges after trial and the remaining charges were dismissed or refused by the District Attorney.[176] Albert does not cite support for his claim that the Eighth Amendment's prohibition against the use of excessive force attaches prior to an adjudication of guilt, or that it prohibits the use of a S.W.A.T. team to execute a search warrant. His opposition does not address the Eighth Amendment, and its argument regarding excessive force discusses only the Fourth Amendment.[177]

Accordingly, Defendants' motion is granted as to Albert's Eighth Amendment claims, which are dismissed.

## F. Fourth Amendment Claims of Unlawful Arrest and Pretrial Detention.

Albert alleges that he was arrested and detained without probable cause in violation of the Fourth Amendment.[178] He asserts that the first search warrant was based upon false allegations by

---

[172] *Id.* at 48.
[173] *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S. Ct. 2321, 2323, 115 L. Ed. 2d 271 (1991).
[174] *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994)(citing *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)).
[175] *Bell v. Wolfish*, 441 U.S. 520, 537 n.16, 99 S. Ct. 1861, 1873, 60 L. Ed. 2d 447 (1979)(quoting *United States v. Lovett*, 328 U.S. 303, 317–318, 66 S.Ct. 1073, 1079–1080, 90 L.Ed. 1252 (1946)).
[176] ECF No. 191 at ¶¶ 5,17; ECF No. 215 at 6.
[177] ECF No. 215 at 47-51.
[178] ECF No. 191 at ¶ 19.

Todd (which Parker and Mayfield "encourage[d]" him to submit),[179] pretext created by Strong's interviews with Sharlette and Dashawna,[180] and Manceaux's misleadingly omitting information from the warrant application,[181] all orchestrated by Craft and assisted by the other Defendants.[182] Albert alleges that the officers who executed the first search warrant improperly seized items that were not named in the warrant and made the improper, race-based assumption that other property they discovered at 212 I-B Street must have been stolen.[183] He further alleges that Defendants acquired additional search warrants based on fraudulent claims that property matching the description of items located at 212 I-B Street had been stolen, entered the residence again, and distributed improperly seized items to representatives of local merchants.[184] Albert also alleges that Defendants damaged and destroyed various other property and documents in the course of these searches, including evidence needed to support his claims here.[185] Shortly thereafter, and on the basis of these improper proceedings, Albert alleges that Officer Cormier "knowingly obtained a defective further arrest warrant for" Albert and detained him.[186] In short, Albert alleges that there was no probable cause for his arrest or detention.

Defendants argue that these claims fail because probable cause existed at every stage of the investigation leading up to Albert's arrest.[187] At the time Albert was arrested, Defendants argue that grounds existed to believe he had committed simple burglary against Tracy, simple battery against Sharlette and Dashawna, improper telephone communications against Todd, possession of stolen goods, and violation of a restraining order, based on eyewitness allegations, investigations,

---

[179] *Id.* at ¶ 24.
[180] *Id.* at ¶ 23.
[181] *Id.* at ¶ 25.
[182] *Id.* at ¶ 21.
[183] *Id.* at ¶¶ 29-30.
[184] *Id.* at ¶¶ 31-34.
[185] *Id.* at ¶ 33.
[186] *Id.* at ¶ 32.
[187] ECF No. 207-1 at 38.

and officer observations.[188] An independent intermediary reviewed those allegations,

investigations, and observations, determined that probable cause existed to arrest him, and issued

warrants directing them to do so.[189] Accordingly, Defendants argue that Albert's claims that he

was arrested without probable cause should be dismissed.

Albert appears to acknowledge that there was a proper basis for his arrest, which was

"partly due to the chaos in his personal life"—specifically, the charges of simple burglary against

Tracy, improper telephone communications with Todd, and simple battery against Sharlette and

Dashawna.[190] Nonetheless, Albert asserts that there was no probable cause to arrest him because

Sharlette and Dashawna were not trustworthy or reliable, which officers should have known.[191]

Albert further points to the fact that Strong was complimented in a performance review for his

arrest, suggesting without evidence that the entire operation against him was an effort to boost the

careers of Strong and Parker and "whitewash the true motives behind the searches, seizures, and

arrests."[192]

The Warrants Clause of the Fourth Amendment mandates that "no Warrants shall issue,

but upon probable cause, supported by Oath or affirmation."[193] While a warrant presumptively

establishes probable cause, that presumption can be attacked.[194] The manner to attack that

presumption is through a *Franks* claim, which asserts that a warrant application included false

information or failed to include true information, when that information was material to the

---

[188] *Id.* at 77.

[189] Defendants imply that the officers might not have pursued Albert if he had spoken with them when asked and provided his side of the story. However, the question of whether probable cause existed, based on what the officers had observed or been told, does not turn on whether Albert did or did not speak to them in the course of their investigation.

[190] ECF No. 215 at 30-31.

[191] *Id.* at 18-19.

[192] *Id.* at 31-32.

[193] U.S. CONST. amend. IV, cl. 2.

[194] *Terwilliger v. Reyna*, 4 F.4th 270, 285 n.10 (5th Cir. 2021); *Hughes*, 100 F.4th at 619.

magistrate's decision. Nonetheless, and despite the fact that Albert asserts that the warrant for his
arrest included false or misleading information, Albert has explicitly abandoned his *Franks* claims,
as discussed above.

Accordingly, the only question remaining is whether there was probable cause for Albert's
arrest and detention at the time he was arrested. Probable cause is not a high bar and requires only
"a probability or substantial chance of criminal activity, not an actual showing of such activity."[195]
It is a "practical and common-sensical standard."[196] In assessing whether probable cause supported
the issuance of an arrest warrant, courts must look to the totality of the circumstances in
determining whether the facts presented to the judicial officer would assure a person of reasonable
caution that the suspect committed the crime for which he is being arrested.[197] Negligence alone
is insufficient to defeat qualified immunity on the question of probable cause.[198] Rather,
misstatements or omissions will "vitiate an affidavit" only if it is established that the misstatements
or omissions were the product "of deliberate falsehood or of reckless disregard for the truth."[199]
"If the facts omitted from an affidavit are 'clearly critical' to a finding of probable cause, then
recklessness may be inferred from the proof of the omission itself."[200]

As discussed above, the record shows that when Albert was arrested, Sharlette, Dashawna,
Todd, and Tracy had all accused him of criminal activity. Strong and Parker submitted affidavits
in support of warrants to arrest Albert which conveyed those accusations, and each was approved
by a judge.[201] The independent intermediary doctrine "typically insulates law enforcement

---

[195] *Winfrey*, 901 F.3d at 495 (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983)); *see also Terwilliger*, 4 F.4th
at 282.
[196] *Winfrey*, 901 F.3d at 495 (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).
[197] *Id.* (citing *Harris*, 568 U.S. at 243).
[198] *Id.*.
[199] *Id.* (quoting *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980)).
[200] *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir. 1990) (quoting *Martin*, 615 F.2d at 329).
[201] ECF No. 207-5 at 122-24.

personnel who rely on" a warrant unless "it is obvious that no reasonably competent officer would have concluded that a warrant should issue."[202] Albert does not dispute that these three arrest warrants were properly issued, and he does not argue that "no reasonably competent officer would have concluded that a warrant should issue" based on the allegations of battery, burglary, and improper communications. Rather, he suggests, without identifying evidence in the summary judgment record, that the true reason for his arrest and detention—or the reason for the length of his detention after his proper arrest—was the charges of possession of stolen property of which he was ultimately acquitted. The question for the Court at this stage, however, is whether there was probable cause for Albert's arrest when he was arrested. The record evidence shows that there is no genuine issue of material fact as to probable cause.

In sum, Albert fails to overcome the first prong of the qualified immunity standard—that Defendants violated a statutory or constitutional right. Accordingly, the Court need not address the second prong of the standard. Albert's Fourth Amendment claims grounded on his arrest and pre-trial detention are barred by qualified immunity. Defendants' motion is granted with respect to these claims, which are dismissed.

## G. Fourth Amendment Claims Regarding Search and Seizure of Albert's Property.

Albert argues that Defendants improperly exceeded the scope of the first search warrant search when they seized property other than firearms and ammunition during the first search.[203] Defendants argue that Albert's Fourth Amendment claims regarding his property should be dismissed because has no standing to challenge the searches and seizures, as he did not own the residence at 212 I-B Street when it was searched.[204] Alternatively, Defendants argue that in his

---

[202] *Hughes*, 100 F.4th at 619 (citations omitted).
[203] ECF No. 191 at ¶¶ 28-29.
[204] ECF No. 207-1 at 53-57.

criminal trial, Albert alleged that he did not live at 212 I-B Street when it was searched and had no knowledge of what might have been inside it, amounting to a judicial admission that Albert had no interest in the property or its contents, and he should be estopped from contradicting that admission in this proceeding.[205] Finally, Defendants argue that the plain view exception and statements by Dashawna allowed officers to seize the electronics and appliances during the first search, which supported the subsequent search warrants.[206]

Albert argues that he owned or had a constitutionally protected interest in the home, even though he was not living there at the time of the search, which Defendants admitted when they charged him with possession of stolen property related to items in the home.[207] Albert alternatively argues that he should not be held to statements made by his attorney in trial because arguments of counsel are not evidence, and that there is no contradiction between his arguing that he owned the home and was not living there when it was searched.[208] Finally, Albert argues that there was no probable cause to seize any of the items taken in any of the searches, and no exception applies.[209]

Defendants first argue that Albert has no Fourth Amendment standing because he has no ownership interest in 212 I-B Street and was not living there when the searches occurred.[210] "Fourth Amendment standing" is "a useful shorthand for capturing the idea that a person must have a cognizable Fourth Amendment interest in the place searched before seeking relief for an unconstitutional search," but is distinct from Article III standing.[211] The protections of the Fourth Amendment turn on whether a plaintiff has "a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action," not merely a property or ownership

---

[205] *Id.* at 57-61.
[206] *Id.* at 67-69.
[207] ECF No. 215 at 10-11.
[208] *Id.*
[209] *Id.* at 23-28.
[210] ECF No. 207-1 at 54-55.
[211] *Terrence Byrd v. United States*, 584 U.S. 395, 410, 138 S. Ct. 1518, 1530, 200 L. Ed. 2d 805 (2018).

interest.[212] Accordingly, Defendants' lengthy discussion of Albert's ownership rights in the
property is not dispositive of Fourth Amendment standing—even one who does not own the
property in question may nevertheless possess "a justifiable, a reasonable, or a legitimate
expectation of privacy" with respect to the property.

The summary judgment record is not unambiguous as to whether Albert had "a justifiable,
a reasonable, or a legitimate expectation of privacy" with respect to the 212 I-B Street property.
For example, even if Albert renounced his inheritance rights in the property, police records show
Albert's address as 212 I-B Street,[213] and Dashawna and Sharlette alleged that they had been living
at 212 I-B Street with Albert or with his permission for several months. And overall, the actions
of the defendant officers throughout the episode shows that they believed Albert to have an interest
in 212 I-B Street when they searched it, and that he stored stolen property there. However, because
Fourth Amendment standing is not jurisdictional, the Court need not decide that issue before
considering the merits of a claim of unreasonable search or seizure.[214] Because the Court concludes
that the searches and seizures at issue fall within an exception to the warrant requirement and
therefore comply with the Fourth Amendment, it need not determine whether Albert had a
sufficient privacy interest in the residence at 212 I-B Street to trigger the protections of the Fourth
Amendment.

The Fourth Amendment generally prohibits searches and seizures of property that occur
without a warrant, unless they are justified by an exception.[215] One such exception is known as the
"plain view" doctrine. For the warrantless seizure of property that is in plain view of an officer to

---

[212] *Barry v. Freshour*, 905 F.3d 912, 914 (5th Cir. 2018); *Carpenter v. United States*, 585 U.S. 296, 304, 138 S. Ct.
2206, 2213, 201 L. Ed. 2d 507 (2018).
[213] ECF No. 207-7 at 257-69.
[214] *Byrd*, 584 U.S. at 410.
[215] *Horton v. California*, 496 U.S. 128, 133, 110 S. Ct. 2301, 2306, 110 L. Ed. 2d 112 (1990)(citations omitted); *United
States v. Turner*, 839 F.3d 429, 432–33 (5th Cir. 2016).

be lawful, "the officer must have had lawful authority to be in the location from which he viewed the evidence, and the incriminating nature of the item must be 'immediately apparent.'"[216] Albert does not dispute that Defendants entered 212 I-B Street to search for firearms pursuant to a warrant that was supported by probable cause. Instead, he objects that the electronics and appliances seized did not have an "immediately apparent" incriminating nature.[217] "The incriminating nature of an item is immediately apparent if the officers have probable cause to believe that the item is either evidence of a crime or contraband."[218] As with probable cause to effect an arrest, courts consider the totality of the circumstances, "including the officers' training and experience as well as their knowledge of the situation at hand," to determine whether probable cause existed to believe an item is evidence of a crime or contraband.[219] The probable cause burden is not high, as "it is not necessary that the officer know that the discovered res is contraband or evidence of a crime, but only that there be a practical, nontechnical probability that incriminating evidence is involved."[220]

Here, prior to the first search of the residence, former residents of the house told officers that Albert stored stolen items at 212 I-B Street. Specifically, Sharlette and Dashawna alleged that Albert stored stolen items including furniture, electronics, and appliances, and that these stolen items were scattered around the house, some in their original packaging. Sharlette stated that the stolen items included "big screen televisions, DVD players, furniture, and other electronics."[221] When officers executed the first search warrant and entered the residence, they observed appliances and electronics in plain sight that appeared to be new in their original packaging—

---

[216] *Turner*, 839 F.3d at 432–33 (quoting *Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)). Officers may also seize "property that has a sufficient nexus to the crime being investigated" which is in plain view, *Creamer v. Porter*, 754 F.2d 1311, 1318 (5th Cir. 1985)(citations omitted), but Defendants do not assert a sufficient nexus between the firearms sought and the allegedly stolen property seized in the first search.

[217] ECF No. 215 at 25-28.

[218] *Turner*, 839 F.3d at 432–33 (quoting *United States v. Buchanan*, 70 F.3d 818, 826 (5th Cir. 1996)).

[219] *Id.*

[220] *Id.* (quoting *United States v. Espinoza*, 826 F.2d 317, 319 (5th Cir. 1987)(quotations omitted).

[221] ECF No. 201-1 at 9.

similar to the descriptions provided by Sharlette and Dashawna.[222] While still in the residence, Strong called Dashawna about the items observed in the residence and confirmed that Albert had confided in Dashawna that the items were stolen.[223] Strong also testified that, based on her past experience working with stolen property, the items observed in the residence had the hallmarks of stolen property—items in brand new condition that did not appear to have been used and which were stored in the original packaging.[224]

Albert disputes the veracity of Sharlette's and Dashawna's statements that the items stored at 212 I-B Street were stolen, but he does not dispute that their statements were conveyed to the defendant officers. Nor does Albert address the testimony of the defendant officers that the appearance of the items in the house had the hallmarks of stolen property based on their experience dealing with stolen property, other than to argue that they were in their original packaging to protect them from damage while he rebuilt the home.[225] Even if this explanation is true, it does not undermine the totality of the circumstances known to the officers at the time of the search, which is the test of probable cause. Considering the evidence as a whole, Albert has not established that the items observed and seized as potentially stolen property were seized without probable cause.

Albert's reliance on *Creamer v. Porter*[226] to argue that the seizures of electronics and appliances exceeded the scope of the first search warrant is misplaced. In *Creamer*, a passerby noticed a television set in the window of a used merchandise store that resembled one that had been stolen from his home in a burglary.[227] He entered the store and recognized a second television that had also been stolen from his home.[228] The man filed a report with police, who obtained a

---

[222] ECF Nos. 207-6 at 275; 207-4 at 53.
[223] ECF No. 207-5 at 46-47.
[224] *Id.* at 106.
[225] ECF No. 215 at 23.
[226] 754 F.2d 1311 (5th Cir. 1985).
[227] *Creamer*, 754 F.2d at 1314.
[228] *Id.* at 1315.

search warrant to find and seize only the two television sets, described by size, color, and serial number.[229] When the warrant was served, the store owner was not present but his sister opened the door for the officers. Officers seized both sets within fifteen minutes of entering the store, but then continued to "completely search[]" the store for additional property that might be stolen, and questioned the owner's sister about other items that were listed as stolen in the passerby's report but were not included in the warrant.[230] After officers finished searching the store, they ordered the owner's sister to open the locked door to the store's office, where officers searched file drawers, the owner's personal desk, and a safe.[231] Officers seized additional items from the office and then requested backup to continue the search.[232] When the store owner called and spoke to the officers, they informed him that they had a warrant to search the entire premises, not simply to seize two television sets.[233] Officers then searched the owner's apartment, in an adjacent building on the property, and seized additional items there.[234]

In *Creamer*, the Fifth Circuit affirmed the district court's holding that the extended searches and seizures violated a clearly established Fourth Amendment right because the officers did not provide any reason to believe the items seized beyond the television sets were stolen.[235] According to the court, the mere fact that suspected stolen goods were found in a store selling used merchandise did not give police carte blanche to search and seize anything and everything in the store, much less the neighboring apartment. In fact, in that case, the officers testified that their understanding of the law was that "if they were validly on the premises, they could seize

---

[229] *Id.*
[230] *Id.*
[231] *Id.*
[232] *Id.*
[233] *Id.*
[234] *Id.*
[235] *Id.* at 1318-19.

anything."[236]  According to the court, that would not be the understanding of a reasonable officer with the specific experience and training of the officers in that case.[237]

*Creamer* does not support Albert's claims. In *Creamer*, the officers conducted a full search of the premises and an adjacent building, including file drawers and a safe, based on only information indicating that two stolen television sets were at the location. In contrast, Dashawna and Sharlette, who alleged they had been living at 212 I-B Street for several months with Albert or with his permission, informed Strong prior to the first search that Albert was storing numerous stolen goods at the home, such as "furniture, electronics and even a hot tub," and that he had confirmed to the women that the items were stolen.[238] Around the same time, Parker received an unrelated anonymous report, allegedly from a family member of Albert, that Albert possessed stolen goods at 212 I-B Street.[239]

Upon entering the premises and finding the pellet guns, Strong called Dashawna to confirm that those were the guns Dashawna observed.[240] However, the scope of the warrant was broader than the firearms described by Dashawna—it included "all firearms, ammunition, ammunition clips, ammunition boxes, firearm storage boxes, spent projectiles, spent cartridges, and firearms or ammunition paperwork."[241] Strong also asked Dashawna about the stolen items she had mentioned previously, and Dashawna confirmed that many items of electronics, appliances, and furniture in the home were stolen.[242] The officers seized items matching that general description, and took photos, descriptions, and serial numbers of further items in order to investigate whether

---

[236] *Id.* at 1319.
[237] *Id.*
[238] ECF No. 207-4 at 12-13.
[239] *Id.* at 29.
[240] ECF No. 207-5 at 45-46.
[241] ECF No. 207-1 at 53-54.
[242] ECF No. 207-5 at 46.

they might have been stolen.[243] Officers sought and obtained further search warrants when they

found matching reports.[244] In short, the defendant officers in the present case possessed

information that justified seizing suspected stolen property that was in plain view—information

that the officers in *Creamer* lacked.

Albert further argues that Sharlette and Dashawna were not reliable witnesses, and that

Defendants had a duty to investigate the veracity of their statements before seizing the items or

seeking further warrants.[245] However, an eyewitness identification of the perpetrator of a crime

"will establish probable cause unless, at the time of the arrest, there is an apparent reason for the

officer to believe that the eyewitness was lying or mistaken."[246] And the Constitution "does not

guarantee that only the guilty will be arrested[,] nor does it require officials to perform an error-

free investigation."[247] Albert does not point to evidence that he contends should have put the

defendant officers on notice that Sharlette's and Dashawna's statements were not truthful,

especially given that the defendant officers observed items in plain sight that appeared to

corroborate their statements.

Based on the summary judgment record the defendant officers had a factual basis to believe

that many of the electronics, appliances, and furniture items in the home constituted "evidence of

a crime or contraband."[248] The seizure thus fit the plain view exception to the Fourth Amendment's

warrant requirement. Albert has not come forward with summary judgment evidence sufficient to

create a genuine question of material fact as to whether there was probable cause to believe the

seized items were evidence of a crime or contraband. Moreover, as discussed above, Albert does

---

[243] ECF No. 207-6 at 275.
[244] *Id.* at 275, 277.
[245] ECF No. 215 at 18-21.
[246] *Roy*, 950 F.3d at 256 (quoting *United States v. Burbridge*, 252 F.3d 775, 778 (5th Cir. 2001)).
[247] *Nerio v. Evans*, 974 F.3d 571, 575 (5th Cir. 2020)(internal quotations omitted).
[248] *Turner*, 839 F.3d at 433.

not challenge the warrants for any of the three searches, so he does not overcome the presumption of probable cause for each of them.

In sum, Albert fails to overcome the first prong of the qualified immunity standard—showing that Defendants violated a statutory or constitutional right. Accordingly, the Court need not address the second prong of the standard. Albert's Fourth Amendment claims based on his allegations that Defendants engaged in unreasonable searches and seizures of his property are barred by qualified immunity. Defendants' motion is granted with respect to these claims, which are dismissed.

## H. **Fourth Amendment Excessive Force Claims.**

In the Amended Complaint, Albert alleges that Defendants used excessive force under the Fourth Amendment when they engaged S.W.A.T. teams to assist with the searches, "destroy[ed] his home and much of its contents," and "euthanize[d] his innocent pets."[249] Albert does not allege that excessive force was used against him personally, and his opposition narrows his claims to asserting that Defendants used excessive force when they employed S.W.A.T. teams to assist with searches related to misdemeanor charges.[250] Relatedly, Albert suggests that Defendants used excessive force by providing "misinformation to the [S.W.A.T.] team which had the effect of" suggesting to the S.W.A.T. team that Albert was "a dangerous felon engaged in criminal activity."[251] Albert's excessive force claims appear to be based on allegations that Defendants unreasonably destroyed or damaged property during the course of the searches. Albert was not present at 212 I-B Street when the S.W.A.T. team or Defendants entered the residence, and,

---

[249] ECF Nos. 191 at ¶ 45; 215 at 47-50.
[250] ECF No. 215 at 47-50.
[251] ECF Nos. 191 at ¶ 45; 215 at 47-50.

accordingly, there is no evidence that force was applied to Albert personally or that he suffered any injuries when the search warrants were executed.

Defendants seek dismissal of these claims on the grounds that they are barred by the *Parrat/Hudson* doctrine, that Albert does not own the residence at 212 I-B Street, and that he has provided no evidence that any defendant caused sufficient damage to constitute excessive force under the Fourth Amendment.[252] However, the *Parrat/Hudson* doctrine is inapplicable here. Defendants assert that, under this doctrine, a section 1983 claim for violation of due process "is not cognizable when state law claims, such as conversion, provide an adequate remedy."[253] The Fifth Circuit has expressly rejected this interpretation of the doctrine.[254] The *Parrat/Hudson* doctrine "dictates that a state actor's *random and unauthorized deprivation* of a plaintiff's property does not result in a violation of procedural due process rights if the state provides an adequate post-deprivation remedy."[255] This doctrine "is meant to protect the state from liability for failing to provide pre-deprivation process in situations where it cannot anticipate the need for such process (when actions are random and unauthorized)."[256] For example, the defendant in the case cited by Defendants, *Rinker v. Harrison*,[257] was a deputy who allegedly ransacked the plaintiff's home in order to intimidate the plaintiff, and was not conducted pursuant to any law, policy, custom, or direction by a superior. The court in *Rinker* held that the plaintiff's section 1983 claims were barred by the *Parrat/Hudson* doctrine.[258] None of the parties here asserts that Defendants' actions in arresting Albert or searching 212 I-B Street were "random and unauthorized." Rather, all agree

---

[252] ECF No. 207-1 at 79.
[253] *Id.* at 74.
[254] *Brooks v. George Cnty., Miss.*, 84 F.3d 157, 165 (5th Cir. 1996).
[255] *Id.* (emphasis in original).
[256] *Id.* (citing *Zinermon v. Burch*, 494 U.S. 113, 128–32, 110 S.Ct. 975, 984–87, 108 L.Ed.2d 100 (1990)).
[257] No. CIV.A. 10-372, 2010 WL 4553501, at *6 (E.D. La. Sept. 10, 2010), *report and recommendation adopted*, No. CIV.A. 10-372, 2010 WL 4553500 (E.D. La. Nov. 3, 2010).
[258] *Rinker*, 2010 WL 4553501 at *9.

that the defendant officers had warrants for each search and Albert's arrest. The dispute is whether Defendants exceeded the scope of those warrants. Accordingly, the *Parrat/Hudson* doctrine does not bar Albert's excessive force claims.

However, the Court's rejection of the *Parrat/Hudson* doctrine does not end the inquiry. The Court must further address whether the summary judgment record reveals a genuine factual dispute regarding whether Defendants used excessive force when they executed the searches of 212 I-B Street. The Amended Complaint lists items which were allegedly lost or destroyed during or after the searches.[259] Defendants argue that any property damage was *de minimis*, any damage to the home predated the searches, and Albert has no proof of damage to property beyond his self-serving testimony and declaration.[260] Albert argues that he cannot provide additional evidence of property damages because many of the items he claims were damaged were purchased from other individuals and did not come with receipts, and any receipts he had were lost during or after the officers' searches.[261]

"Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression."[262] Whether the force used to effect a search was reasonable under the Fourth Amendment "is generally assessed by carefully weighing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[263] "The operative question in excessive force cases is whether the totality of the circumstances justifies a particular sort of search or seizure."[264] This is

---

[259] ECF No. 191 at ¶¶ 33,52.
[260] ECF No. 207-1 at 80-82.
[261] ECF No. 215 at 14.
[262] *United States v. Ramirez*, 523 U.S. 65, 71, 118 S. Ct. 992, 996, 140 L. Ed. 2d 191 (1998).
[263] *Cnty. of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 427–28, 137 S. Ct. 1539, 1546–47, 198 L. Ed. 2d 52 (2017)(citations and quotations omitted).
[264] *Mendez*, 581 U.S. at 427–28 (cleaned up).

an "objective inquiry that pays careful attention to the facts and circumstances of each particular case" that is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[265] "Excessive force claims ... are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred."[266]

Albert argues that the employment of a S.W.A.T. team constitutes excessive force against his property and an attempt to intimidate him because it was disproportionate to the crimes with which he was charged.[267] He does not appear to assert that the S.W.A.T. team destroyed any property, nor does he identify record evidence supporting such destruction. Albert asserts that their mere presence constituted excessive force.[268]

Albert does seek damages for the alleged loss of numerous items of property which are generally described in the Amended Complaint, including "personal belongings including but not limited to clothes, shoes, cologne, jewelry; including watches, rings, chains, etc.," "household appliances including, but not limited to a refrigerator, a small refrigerator, personal cabinet space refrigerator, two (2) microwaves, toaster oven, coffee maker, blender, George Foreman grill, rice cooker, crock pot, deep fryer, electric can opener, kitchen appliances, etc.," and "children's belongings including, but not limited to clothes, shoes, toys, jewelry, including watches, rings, chains, etc."[269] However, Albert does not identify evidence in the summary judgment record showing with any specificity which items were damaged, destroyed, or seized, other than suspected stolen property that was validly seized. Nor does Albert point to evidence in the summary judgment record showing items that were damaged or destroyed by officers during the

---

[265] *Id.* (quotations and citations omitted).
[266] *Id.*
[267] ECF No. 215 at 47-50.
[268] *Id.*
[269] ECF No. 191 at ¶ 52.

search in contrast to items that were seized and held as potential evidence or returned to merchants who had reported them stolen.

The record does include evidence of items police seized during the searches, what they returned to merchants, and what remaining evidence was auctioned in 2016 (two years after trial and five years after arrest).[270] However, the losses alleged in the Amended Complaint go far beyond what is described in the seizures or the auction. More importantly, Albert does not claim that the auction violated a statutory or constitutional right—none of his claims are expressly grounded on the auction. Therefore, the mere seizure of items during the searches does not give rise to a claim of "excessive or unnecessary destruction of property."

Finally, at his criminal trial for possession of stolen goods, Albert did not dispute that certain items which were seized from 212 I-B Street and returned to merchants had been stolen, which he appears to challenge here.[271] As discussed above, he argued instead that he was not living at 212 I-B Street when the searches occurred, was not involved with bringing the stolen items into the home, and had no knowledge of them or control over the items, supported by the testimony of Cassandra, Tracy, and Mark.[272] But Albert does not sufficiently distinguish the items that were properly seized because they were stolen from the items that were allegedly improperly seized. To the extent that Albert claims other, unidentified property was seized or destroyed, he points to no

---

[270] ECF Nos. 207-5 at 168-69, 243-44; 207-7 at 212-17; 215-7 at 1-4.

[271] ECF No. 207-7 at 140-43.

[272] *Id.* at 76-121, 140-43 (where Albert's counsel argued in closing that the stolen property came to 212 I-B Street "by way of Todd, [S]harlette, and D[a]shawna. Albert, himself, didn't know that the property was stolen at all…. Albert had nothing to do with it"). "An attorney's remarks, made in closing, constitute binding admissions against the party he represents." *Montano v. Orange Cnty., Texas*, 842 F.3d 865, 882 (5th Cir. 2016)(quoting Saucier v. Plummer, 611 F.3d 286, 288 (5th Cir. 2010))(cleaned up). A statement by counsel during trial may be considered a judicial admission if it was made intentionally as a waiver, releasing the opponent from proof of fact. *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001). Here, the assertions by Albert's counsel released the state from having to prove that the seized items were stolen.

evidence in the summary judgment record sufficient to create a genuine issue of material fact as
to whether Defendants exercised excessive force in seizing or damaging that property.

Albert also appears to seek damages for the loss of his pets due to the use of excessive
force. As discussed above, while the summary judgment record suggests there is a genuine dispute
as to whether Albert has a cognizable interest in the dogs he alleges were lost,[273] the record does
not support a finding that any of the named defendants were involved in seizing the dogs.[274]

In sum, Albert fails to overcome the first prong of the qualified immunity standard—that
Defendants violated a statutory or constitutional right. Accordingly, the Court need not address
the second prong of the standard. Albert's Fourth Amendment claims based on excessive force are
barred by qualified immunity. Defendants' motion is granted with respect to these claims, which
are dismissed.

## I.   <u>Conspiracy Under Section 1985.</u>

Albert alleges conspiracy under sections 1983 and 1985(3) among the Defendant
officers.[275] Defendants argue that the conspiracy claims must be dismissed because employees of
the same governmental agency cannot conspire together, as a matter of law, and are not actionable
absent a constitutional violation.[276]

To prove a conspiracy under sections 1983 and 1985, a plaintiff must prove (1) a conspiracy
by state actors and (2) a deprivation of civil rights in furtherance of the conspiracy.[277] The Court
has found that no genuine issue of material fact exists as to whether Defendants' conduct

---

[273] ECF Nos. 23; 85-88; 207-6 at 40; 207-7 at 357-60.
[274] ECF Nos. 207-4 at 15-36, 207-5 at 53-55.
[275] ECF No. 191 at ¶¶ 46-48.
[276] ECF No. 207-1 at 94.
[277] *Shaw v. Villanueva*, 918 F.3d 414, 419 (5th Cir. 2019)(citations omitted).

constituted any constitutional deprivations. Consequently, there can be no genuine dispute regarding whether any Defendants conspired to deprive Albert of his constitutional rights.

Accordingly, Defendants' motion is granted as to Albert's conspiracy claims, which are dismissed.

**J.   Intentional Infliction of Emotional Distress.**

Finally, Albert asserts that Defendants' motion must be denied because it fails to address his state law claims for intentional infliction of emotional distress.[278] Albert acknowledges that the Amended Complaint does not allege or refer to state law claims for intentional infliction of emotional distress, but cites his prior pleadings to show they were properly asserted.[279] The Court is not persuaded.

First, to the extent the Amended Complaint alleges Albert has experienced emotional distress, it does so only as a species of damages resulting from the Defendants' use of excessive force under the Fourth, Eighth, and Fourteenth Amendments.[280] Even if Albert had asserted a stand-alone claim under section 1983 for intentional infliction of emotional distress, such a claim "fails to rise to the level of a constitutional violation."[281]

More conclusively, this issue has already been determined. In his opposition to Defendants' motions to dismiss, Albert argued that the original complaint "specifically alleged that Craft authorized, condoned, and ratified unconstitutional searches and seizures … and intentional infliction of emotional distress."[282] He further argued that Defendants' seizure of his pets was "intended to cause significant emotional pain in addition to being another meaningful deprivation

---

[278] ECF No. 224 at 9-10.
[279] *Id.* (citing ECF Nos. 1, 56, 58, 80, 109, 191).
[280] ECF No. 191 at ¶¶ 45, 52.
[281] *Wolfe v. Quave*, 79 F. App'x 648 (5th Cir. 2003).
[282] ECF No. 172 at 6.

of his constitutional rights."[283] After a review of the pleadings and applicable law, the Court held that Albert's complaints prior to the present Amended Complaint were insufficient to plead plausible section 1983 claims against the Defendants in their personal capacities.[284] Furthermore, the Court held that, while the previous amended complaint "refers to Louisiana state law on a number of occasions … it is not clear that the [previous amended complaint] asserts state law causes of action independent of the federal claims expressly pled" therein.[285] The Court declined to grant Albert "leave to add state law claims for the first time in an amended complaint."[286] In short, the Court has already found that Albert's numerous pleadings prior to the Amended Complaint failed to sufficiently assert state law claims against the Defendants, and denied leave to add them in the Amended Complaint.

Consequently, the Amended Complaint does not assert state law claims, including for intentional infliction of emotional distress. The fact that the Defendants' motion does not discuss claims for intentional infliction of emotional distress does not persuade the Court to deny it.

## K. **Defendants' *Daubert* Motion is Moot.**

In light of the dismissal of all of Albert's remaining claims, Defendants' *Daubert* motion is moot, and is therefore denied.

---

[283] ECF No. 175 at 50.
[284] ECF No. 188.
[285] *Id.* at 26.
[286] *Id.*

Page **41** of **42**

## IV.
### CONCLUSION

In light of the foregoing,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment [ECF No. 207] is GRANTED. Albert's claims against Defendants in the Amended Complaint are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendants' *Daubert* Motion to Exclude Testimony of Andrew J. Scott, III [ECF No. 204] is DENIED AS MOOT.

THUS DONE in Chambers this 18ᵗʰ day of December, 2024.

**ROBERT R. SUMMERHAYS**
**UNITED STATES DISTRICT JUDGE**